THE PEOPLE *ex rel.* John J. Healy, State's Attorney,

*v.*

MORRIS FRISCH.

*Opinion filed October 24, 1905—Rehearing denied Dec. 13, 1905.*

1. DISBARMENT—*instituting prosecution to extort money from client is ground for disbarment.* Instituting a criminal prosecution, either directly or by collusion, for the purpose of extorting money from clients by representing that they are likely to be sent to the penitentiary on the charge, which is dismissed for want of prosecution after obtaining their money, is ground for disbarment.

2. SAME—*what tends to show that prosecution was in attorney's control.* The fact that an attorney goes upon his clients' bonds on a criminal charge in the sum of $500 each after receiving $100 in money from them to settle the case, and that he afterwards advised them not to appear, inducing one of them to leave the State, tends to show that he knew the prosecution was in his control, and that he instituted it directly or by collusion with the person who did.

INFORMATION for disbarment.

This is an information filed in this court by John J. Healy, State's attorney of Cook county, praying that the name of Morris Frisch, the respondent, be stricken from the rolls of this court as an attorney and counselor at law.

The information alleges that on the first day of June, 1903, a suit was commenced in the circuit court of Cook county, Illinois, by one Robert J. Frank against one William Delaney and Carrie A. Delaney, (then Carrie A. Henry,) seeking to recover damages against the defendants for slander of title to real estate in Ohio; that on the 8th day of July they employed the respondent, Morris Frisch, as their attorney to represent them in defense of that suit, and they paid him a retainer of $50; that at that time there was pending in one of the courts of Ohio a suit brought by the said Carrie A. Henry against E. Roscoe Frank, a cousin of said Robert J. Frank, by which suit the said Carrie A. Henry sought to establish a common law marriage with E. Roscoe

Frank, and to enjoin the transfer of certain real estate which was then standing in the name of Robert J. Frank; that shortly after the employment of said respondent, as aforesaid, depositions were taken in Chicago on behalf of the defendants in the Ohio suit; that Carrie A. Henry thereupon employed Morris Frisch to appear before the commissioner and cross-examine the witnesses produced by the defendants in the Ohio suit in the taking of such depositions; that during his employment as attorney for said Carrie A. Henry and William Delaney the said Morris Frisch, the respondent, learned that it was claimed that the said William Delaney and Carrie A. Delaney were living together in the city of Chicago in an open state of adultery; that the respondent, taking advantage of.the knowledge thus gained, and for the unlawful and corrupt purpose of unlawfully extorting money from the said William Delaney and Carrie A. Henry, procured the issuance of a warrant by Joseph G. Sheldon, a justice of the peace within and for the said Cook county, for the arrest of the said William Delaney and Carrie A. Henry on the charge of adultery; that said warrant was based upon a complaint pretended to be sworn to before said justice of the peace by one Robert Reid, it being alleged and stated in said complaint that on the 18th day of July, 1903, and for three months prior thereto, William Delaney and Carrie A. Henry were living together in an open state of adultery, the said Carrie A. Henry, *alias* Mrs. William Delaney, being then and there a married woman, contrary to the form of statute in that behalf made and provided; that on the 20th day of July, 1903, Carrie A. Henry informed the respondent by telephone that some one, apparently an officer, had been looking for her on the 18th, and the said respondent then and there, after pretending to learn by telephoning to several justices of the peace, informed the said Carrie A. Henry that a warrant was out for herself and said William Delaney charging them with the crime of adultery, and that they had better come to his office immediately; that the said

Carrie A. Henry and William Delaney did on July 20, 1903, immediately go to the office of the respondent, and were then and there informed by the respondent that the charge was a very serious one; that the penitentiary was open before them, and that if he got them clear from the charge they would have to pay him $200, and that after he had settled with the justice and Robert Reid there would be little coming to him for fees; that said William Delaney then and there informed Frisch that he did not have $200 but could give him only $100, and the respondent agreed to wait for the remaining $100 until a later date; that thereupon the respondent went with Carrie A. Henry and William Delaney to the office of Justice Sheldon and gave bond in the sum of $500 each for their appearance before said justice upon the hearing of said charge, which was set for the 25th day of July, 1903, at the hour of nine o'clock A. M., and that the said respondent became surety on said bonds for their appearance before the justice at the time set for the hearing of said charge; that thereupon the respondent told the said William Delaney and Carrie A. Henry that they need not appear at the time set for the hearing, and said complaint was at the time of the hearing dismissed for want of prosecution; that as a matter of fact no one by the name of Robert Reid appeared and signed said complaint; that the depositions aforesaid were taken on July 23; that the respondent appeared as attorney for and on behalf of the said Carrie A. Henry and cross-examined the witnesses; that said respondent also advised said Carrie A. Henry to bring suit against Robert J. Frank and E. Roscoe Frank *et al.* for malicious prosecution, and the said Carrie A. Henry paid the respondent the costs for commencing such a suit and $25 for services; that the respondent afterwards filed a *præcipe* in the circuit court of Cook county directing the clerk to issue a summons against the defendants upon a plea of trespass on the case for $50,000 damages; that said summons was delivered to the respondent by the clerk, but the same was never

served and no declaration has ever been filed in said cause; that at or about said time said Carrie A. Henry employed the respondent to go to Cleveland to meet said Carrie A. Henry at Cleveland on or about the 27th day of July, 1903, for the purpose of interviewing witnesses whose testimony was to be taken for use in the Ohio case, and paid the respondent the sum of $35 for his expenses to Cleveland; that at the time of said payment the respondent agreed to meet the said Carrie A. Henry in Cleveland; that he failed to meet the appointment, and afterwards said he never had any intention of keeping the same; that Carrie A. Henry returned to Chicago, and on August 4, 1903, called, with William Delaney, upon the respondent, and charged him with instigating the prosecution of adultery before Justice Sheldon for the purpose of extorting money, and also obtaining money from them for expenses to Cleveland with no intention of going to Cleveland, whereupon the respondent returned the $35 paid to him for expenses to Cleveland and the $100 paid him in the criminal prosecution before Justice Sheldon, and requested the said William Delaney and Carrie A. Henry, in consideration of the re-payment of said moneys, not to cause him any trouble in the premises.

The answer of the respondent admits all the allegations of the information except the following: (1) The procuring of the issuance of the warrant before Justice Sheldon; (2) the conversation on July 20, 1903, in which it is alleged that he informed the said Carrie A. Henry and William Delaney that the charge was a serious one, that the penitentiary was open before them, and that if he got them clear of the charge they would have to pay him $200, and that after he had settled with the justice and Robert Reid there would be little coming to him for fees; (3) that he told Carrie A. Henry and William Delaney that they need not appear at the time the complaint was set before the justice; (4) and as an explanation of his returning the $135, alleges a secret agreement with William Delaney, who, he alleges, had been

a client of his for many years, by which secret arrangement he was to take Delaney's money, apparently for legal services, with the hope of getting the said Carrie A. Henry to leave the said William Delaney of her own accord, and that the money was by that agreement to be returned to Delaney.

The cause was referred to a master in chancery to take and report the testimony, and the proofs have been taken and reported to this court.

JOHN J. HEALY, State's Attorney, (JOHN L. FOGLE, of counsel,) for relator.

ROSENTHAL, KURZ & HIRSCHL, for respondent.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The testimony tends very strongly to show that the respondent procured the warrant to be issued by Justice Sheldon for the arrest of his clients, Delaney and Carrie A. Henry. The information on which the warrant was issued was signed by Robert Reid. No such person seems to be known to any of the parties, to any witnesses herein, or to the justice who issued the warrant. The respondent denied that he signed the complaint. The justice of the peace before whom the complaint was sworn to, testified that he did not know the person who signed it, and that he did not then know and so far as he could recollect had never seen the respondent; that he saw the respondent on Monday following the signing of the complaint on Saturday, and that he did not then recognize him as being the person who signed the complaint or as the person who was in company with the person who signed it, and on cross-examination said he had no impression whatever on the question whether the respondent was the person who signed the complaint or was present when it was signed. Two experts in handwriting testified that in their opinion the name of Robert Reid found attached to the complaint was in the handwriting of the respondent.

The warrant was issued on Saturday, July 18, at about the noon hour. Carrie A. Henry testified that between eight and nine o'clock on the following Monday she telephoned to the respondent that someone, thought to be an officer, had been at their house looking for her and Delaney on Saturday afternoon, and asked respondent if he knew what the man wanted, and that respondent replied, "Yes," and that they were to come to his office at once,—"that a warrant was out for our arrest." Delaney testified he was standing with Carrie Henry at the 'phone and that the reply came at once from the respondent. The respondent testified that when Carrie Henry called him over the 'phone he said, "Why don't you let the gentleman in and ascertain what he wants? If he comes around again find out for yourselves and I will do all I can," and that he at once began calling justices of the peace over the 'phone and inquiring if any complaint had been filed against Delaney and Carrie Henry; that Justice Sheldon, who issued the warrant, was the third justice that he called up, and that he then learned of the complaint and then telephoned to Delaney and Carrie Henry to come to his office at once, etc. They came to his office, and both testified that he told them they were charged with a serious crime and might be sent to the penitentiary, and demanded $200, and said he could not get them out for much less than that sum; that he would have to give Justice Sheldon $100 and see Robert Reid "and fix it with him," and that by the time he was through he would have to use all of the money; that they agreed to pay him $100 in cash and $100 in six months; that he consented, and agreed also to become surety for them on their bonds; that they went to the office of the justice of the peace and he did sign a bond for each of them for their appearance five days later, being on Saturday, the 25th day of July, and they paid him $100 in cash.

On the 23d day of July the respondent, as attorney for Carrie A. Henry, was engaged in taking depositions in the Reaper Block, in Chicago, in the case which she had pending

in Ohio against E. Roscoe Frank. It was then arranged between her and the respondent that she should go to Cleveland, Ohio, on the 24th day of July and he would meet her there on the 27th to interrogate certain witnesses whose testimony was desirable, to be used in her behalf in the suit in Ohio, and she paid him $35 for his services. He testified that the money was paid to him for his expenses and that he agreed to meet her in Cleveland and question her witnesses. Carrie Henry and Delaney both testified that respondent told them that she need not appear at the justice office on Saturday, but could go to Cleveland. Delaney testified that afterwards the respondent told him that he need not appear before the justice,—that he (respondent) "would square the whole matter up." Carrie Henry was in Ohio on Saturday, the day on which the criminal charge was set for hearing, and Delaney did not go to the office of the justice. The case was dismissed by the justice on Saturday for want of prosecution. The transcript shows this much and no more. The justice testified that he had no recollection about what occurred on Saturday. The respondent remained in Chicago, and testified that he did not attend before the justice on Saturday and knew nothing about what was done on Saturday at the justice's court, except that he heard that the case was dismissed for want of prosecution. He did not go to Cleveland, and when Carrie A. Henry returned to Chicago she was indignant and demanded that he pay back her money, and he re-paid to her the $35 she had paid him to go to Cleveland and also re-paid to her and Delaney the $100 paid him as attorney's fee in the case against them before the justice, and went with them to the justice office and got a certified copy of the record showing that the criminal proceeding had been dismissed. Robert Reid, whose name was used as the person complaining in the criminal proceeding, could not be found, and was and is unknown. There was no actual prosecution of the cause, and clearly it was not intended there should be.

The fact that respondent had become obligated on the bonds of Delaney and Carrie Henry in the sum of $500 each for their appearance at the office of Justice Sheldon on Saturday, July 25, and that he directed her to go to Ohio and be there on the day she was to appear before the justice, impresses us with the conviction that the respondent knew he could control the prosecution, and is consistent with the charge that he had procured it to be instituted.

The respondent testified that he was not the attorney for Delaney or Carrie A. Henry in the case in the justice court; that when Delaney and Carrie Henry came to his office on Monday morning after the warrant had been issued, he called Delaney aside and told him that he (Delaney) had gotten into trouble because of his relations with the Henry woman, and that he would get into more trouble unless he "dropped her;" that Delaney said that he "must see her through this trouble, as there was no telling what she would do if he left her in the lurch then," and that he, (respondent,) in order to assist Delaney, agreed to sign the bond for his appearance, but told Delaney he "would have nothing more to do with his troubles so long as he hung around this woman,"—that he "would travel no further with him;" that they then went to the office of the justice and he signed the bond for Delaney, and finally, after Delaney had pleaded with him, signed the bond for the appearance of Carrie A. Henry; that he (respondent) "told Mr. Delaney then that he would have to look out for himself. He said, 'What will we do now?' I said, 'You turn over what money you have to me, on the pretense that you are paying a fee to me, and probably if she knows you haven't any more money she will quit you anyhow.' I said, 'You give me what you have got, and I will give you a receipt as if you were paying me a fee, and afterwards you can get it back,' which was done. He gave me, I remember, $100, and I gave him a receipt that he had paid that to me as a fee in this case before the justice." Delaney contradicted the respondent on all of these points.

As to the sending of said Carrie A. Henry to Ohio, the respondent testified: "I was not her attorney. There was no occasion for me to go out there to start with, and there was no way I could assist her in this case. My idea in getting her to go was just to get rid of her, and I so explained to Delaney. I said, 'Once she gets out of the State, perhaps she never will come back, and that is the best way to get rid of her,' and Mr. Delaney agreed with me on that proposition." Delaney again contradicted the respondent and denied each of his statements.

If the respondent had not participated in the institution of the criminal proceeding against Delaney and Carrie A. Henry and did not know that the prosecution thereof was within his control, it is incredible that he should have deliberately arranged for her to go to Ohio with the hope that she would never return and fail to appear before the justice of the peace and to suffer default on her bond, on which he was the sole surety, and thus create a liability against him to pay the sum of $500 because of her failure to appear and answer the charge against her. The respondent, on cross-examination, in the endeavor to relieve himself from this dilemma, testified as follows: "If she went to Cleveland and did not show up in the justice court when this case was set for hearing her bond would be forfeited, and I was surety on that bond, but Mr. Delaney agreed to take care of it, so far as I was concerned on the bond. Mr. Delaney agreed to take care of the surety so that I would not suffer in any event. I don't know if Mr. Delaney had any money or property, except I had known him and I had considerable friendship for him up to that time. I don't know whether he had any property. I supposed he was pretty well fixed. Although he was a night watchman, and had been since I knew him, I supposed he was well fixed. A night watchman does not work on a salary. He gets so much per store by the week or month, and he is making a pretty good sum at it. He agreed to produce himself in court with Carrie. He

agreed to produce Carrie A. Henry. The time I signed her bond, or the bond of Carrie A. Henry, no date had been set for trial. I might have been notified by either Delaney or Carrie what time the case was set for trial. The Delaney bond that I signed fixed the date of the hearing. I don't know that was all to be the same day. I don't know what reason there should be for one hearing one day and the other another day." Delaney denied that any such agreement was made or that any such conversation occurred between himself and the respondent. The transcript of the judgment in the justice court shows the case of both defendants was continued to Saturday, July 25, and the bonds of both show the same.

Another circumstance conceded by the respondent to be true seems entirely inconsistent with the truthfulness of his explanation. On the 15th day of July, 1903, the respondent accepted employment from Carrie A. Henry to bring an action for malicious prosecution against Frank *et al.,* and she paid him a retainer fee of $25. The respondent had not begun the action in question when Carrie A. Henry, at his direction, went to Ohio. He did not re-pay, or offer to re-pay, the sum he had received as such retainer. He desires now to claim that while so retaining this money he conspired with Delaney to have her, his client, go to Cleveland, Ohio, hoping and believing she would not return,—an explanation which, if true, so seriously affects his character for integrity as to entitle his testimony to but little, if any, credence. After Carrie A. Henry returned from Ohio respondent returned to her and Delaney the $100 paid him, as they testified and as a receipt given them showed, to defend them in the criminal case before the justice, and also the $30 or $35 paid him to go to Cleveland, but did not return to her the $25 retainer fee, but on the same day that he returned to them the other sums he filed the *præcipe,* as attorney for Carrie A. Henry, against Frank and others in the suit for malicious prosecution.

Our view is that the evidence warrants the conclusion that the respondent either instituted the prosecution of the criminal charge against Delaney and Carrie A. Henry or was in collusion with those who did institute it, and that the respondent had full power to control the prosecution of the charge, and that he availed himself of the existence of the prosecution, and of his knowledge thereof and the power he possessed to control the same, to extort money from Delaney and Carrie A. Henry.

Respondent's lack of professional fidelity to his clients and of personal integrity in connection with his conduct as an attorney is also fully manifested by his conduct in reference to the malicious prosecution suit and to the matter of taking testimony for Carrie A. Henry at Cleveland. If his testimony is true, he, while retaining $25 of her money paid him as a retainer as her attorney in the above suit, deceitfully colluded with Delaney to have her sent out of the State, permanently, as he hoped, in which event he would render no service for the money which he had received from her as such retainer. He received $30 or $35 from her under agreement with her, as her attorney, that he would go to Cleveland, Ohio, and meet her there and interrogate her witnesses in the suit she had pending there, and in which he had been engaged in taking testimony, as her attorney, in the city of Chicago. He testified that he agreed to go to Cleveland and perform this service and received the sum of $30 or $35 therefor, but insists that that arrangement was but a part of the scheme he had devised to assist Delaney to rid himself of the woman, and testified that though he promised her that he would go, he never intended to go there.

The respondent seems to have no just appreciation of the relation of trust and confidence that the law intends shall exist between client and attorney, nor of that faithfulness and fidelity to his client which the law exacts of an attorney. Our duty is to order that his name be stricken from the roll of attorneys, and such is the judgment of the court.

*Rule made absolute.*